1
2
3
4
5                      UNITED STATES DISTRICT COURT
6                          DISTRICT OF NEVADA
7                                  * * *
8  UNITED STATES OF AMERICA,           Case No. 3:13-cr-00108-MMD-VPC
9                         Plaintiff,               ORDER
10       v.
11 VAN McDUFFY,
   aka VAN McDUFFIE,
12                        Defendant.
13

## I.    SUMMARY

Defendant Van McDuffy was indicted on one count of bank robbery with a
dangerous weapon resulting in death and one count of use of a firearm during a crime
of violence. (ECF No 11.) Before the Court are the following unresolved motions: motion
to dismiss count two ("Motion to Dismiss") (ECF No 42); motion to recognize the specific
intent *mens rea* requirement ("Motion re Specific Intent") (ECF No. 45); and motion to
suppress ("Motion to Suppress") (ECF No. 46). The Court held an evidentiary hearing
on the Motion to Suppress.[1] (ECF Nos. 69, 71.) The government offered the testimony
of FBI Special Agent Chris Taylor and Reno Police Department ("RPD") Detective David
Millsap; McDuffy offered the testimony of its expert witness, Dr. Robert Shaffer. (*Id.*)
The Court also heard argument on the Motion to Dismiss at the end of the first part of
the evidentiary hearing. (ECF No. 69.) The Court has reviewed the briefs relating to
these motions. (ECF Nos. 42, 58, 66, 45, 56, 65, 46, 57 & 64.)

_____

[1]The Court admitted four exhibits introduced by the government ("Gov't Exh.")
(ECF No. 70) and three exhibits introduced by McDuffy ("Defense Exh.") (ECF No. 72).

## II.   BACKGROUND

On October 16, 2013, McDuffy allegedly entered the Bank, brandished a firearm, and demanded money from a teller. A customer intervened to tell McDuffy to leave, and McDuffy allegedly shot the customer. McDuffy then demanded money from another teller, who complied. McDuffy left the Bank. An off-duty RPD officer, who was present during the incident, followed McDuffy and later placed him under arrest.

McDuffy was held in a room at the RPD's homicide unit for about 46 minutes before he was interrogated and given his *Miranda* warnings. (Gov't Exh. 1.[2]) During that time, Foremaster, an RPD detective, sat in the room with McDuffy and engaged McDuffy in conversation. The two discussed McDuffy's background but did not discuss the incident that led to McDuffy's arrest. (*Id.* at 00:00-46:21; ECF No. 46-1 at 3-21.) An RPD homicide detective, David Millsap, and FBI Special Agent Chris Taylor (collectively, "the Officers") conducted McDuffy's interrogation. They talked to him for about 15 minutes, during which time they obtained information relating to McDuffy's background, including the length of time he has lived in Reno and his employment. (Gov't Exh. 1 at 46:22-57:00; ECF No. 46-1 at 21-28.) They then advised McDuffy of his *Miranda* rights. (ECF No. 46-1 at 28-29.) McDuffy waived his rights and during the interrogation, admitted that he robbed the Bank and shot a patron. (*Id.* at 3-47.) McDuffy consented to a search of his residence and a storage unit where he indicated he had gone to retrieve the firearm before he robbed the Bank. (Gov't Exhs. 3, 4.)

McDuffy was indicted on two counts. Count one charges McDuffy with bank robbery with a dangerous weapon resulting in death in violation of 18 U.S.C. §§ 2113(a), 2113(d), and 2113(e). (ECF No. 11.) Count two charges McDuffy with the use of a firearm "during and in relation to a crime of violence for which he may be prosecuted in a court of the United States, that is, bank robbery with a dangerous

---

[2]Gov't Exh. 1 is a video recording that captures the time McDuffy was held through the completion of his interrogation ("the Video"). ECF No. 46-1 is an unofficial transcript of the verbal communications captured on the Video.

weapon resulting in death as set forth in count one of the Indictment, and did cause the death of C.B.S. through the use of a firearm" in violation of 18 U.S.C. § 924(j). (*Id.*)

## III.   MOTION TO DISMISS

McDuffy offers two arguments in seeking to dismiss count two. First, the holding in *Johnson v. United States,* 135 S. Ct. 2551 (2015), which found the residual clause under the Armed Career Criminal Act ("ACCA") to be unconstitutional, should be extended to the residual clause of 18 U.S.C. § 924(c)(3)(B). Second, under the elements clause found in 18 U.S.C. § 924(c)(3)(A), the offense must involve the intentional use of force to qualify as a crime of violence, and because bank robbery with a dangerous weapon resulting in death need not involve intentional killing, it is not a categorical crime of violence under § 924(c)(3)(A). The government responds that the residual clause of § 924(c)(3)(B) does not suffer the same constitutional defects as the residual clause of the ACCA. The government further argues that bank robbery and armed bank robbery qualify as crimes of violence under the elements clause of § 924(c)(3)(A) under established Ninth Circuit precedent.

First and foremost, the Court declines to address McDuffy's argument that the residual clause of § 924(c)(3)(B) is unconstitutional under *Johnson* because the Court finds that the predicate offense — bank robbery with a dangerous weapon resulting in death — qualifies as a crime of violence under § 924(c)(3)(A). The Court need not look to the residual clause of § 924(c)(3)(B).

Count two charges McDuffy with use of a firearm during a crime of violence causing death in violation of 18 U.S.C. § 924(j)(1). Section 924(j)(1) provides that "[a] person, who in the course of a violation of subsection (c), causes the death of a person through the use of a firearm, shall — (1) if the killing is a murder (as defined in section 1111) be punished by death or by imprisonment for any term of years or for life." As pertinent here, subsection (c) — § 924(c)(1)(A) — references "any crime of violence," which is defined under § 924(c)(3) as follows: "(A) has as an element the use, attempted use, or threatened use of physical force against the person or property of

another, *or* (B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." § 924(c)(3)(A)-(B) (emphasis added). Section 924(j)(1) requires proof of an underlying predicate offense of a crime of violence that falls under either § 924(c)(3)(A) or § 924(c)(3)(B)'s definition. Thus, the pertinent question is whether bank robbery with a dangerous weapon resulting in death in violation of 18 U.S.C. §§ 2113(a), 2113(d), and 2113(e) qualifies as a crime of violence under § 924(c)(3)(A).

Resolution of this question requires application of the three-step process set forth in *Descamps v. United States*, 133 S. Ct. 2276 (2013). *See Lopez-Valencia v. Lynch*, 798 F.3d 863, 867-68 (9th Cir. 2015) (applying the analysis to determine whether a conviction under California's theft statute may qualify as an "aggravated felony"); *United States v. Sahagun-Gallegos*, 782 F.3d 1094, 1098 (9th Cir. 2015) (applying the analysis to determine whether a prior conviction qualifies as a "crime of violence" under the Sentencing Guidelines). First, under the "categorical approach," courts must determine whether the statute of conviction is categorically a "crime of violence" by comparing the elements of the statute of conviction with the generic federal definition." *Sahagun-Gallegos*, 782 F.3d at 1098. If the elements of the offense are the same or narrower than the elements of the generic federal offense, then the offense is "a categorical match" and qualifies as a crime of violence. *See Lopez-Valencia*, 798 F.3d at 867. "When a statute is 'overbroad,' meaning that it criminalizes conduct that goes beyond the elements of the federal offense, [courts] turn to step two: determining whether the statute is 'divisible' or 'indivisible.'" *Id.* at 867-68 (citing *Medina-Lara v. Holder*, 771 F.3d 1106, 1112 (9th Cir. 2014)). If it is divisible, then the court turns to step three — the "modified categorical approach" under which the court "may examine certain documents from the defendant's record of conviction to determine what elements of the divisible statute he was convicted of violating." *Id.* at 868. The Court finds that the predicate offense for count two qualifies as a crime of violence under the categorical approach, rendering these latter two steps inapplicable.

Applying the "categorical approach" here, the Court compares the elements of the offense — bank robbery in violation of §§ 2113(a), 2113(d), and 2113(e) — with the generic federal definition of a "crime of violence" under § 924(c)(3)(A). Section 2113 defines bank robbery as follows:

> (a) Whoever, by force and violence, or by intimidation, takes, or attempts to take, from the person or presence of another, or obtains or attempts to obtain by extortion any property or money or any other thing of value belonging to, or in the care, custody, control, management, or possession of, any bank, credit union, or any savings and loan association;
>
> * * *
>
> (d) Whoever, in committing, or in attempting to commit, any offense defined in subsections (a) and (b) of this section, assaults any person, or puts in jeopardy the life of any person by the use of a dangerous weapon or device, shall be fined under this title or imprisoned not more than twenty-five years, or both.
>
> (e) Whoever, in committing any offense defined in this section, or in avoiding or attempting to avoid apprehension for the commission of such offense, or in freeing himself or attempting to free himself from arrest or confinement for such offense, kills any person, or forces any person to accompany him without the consent of such person, shall be imprisoned not less than ten years, or if death results shall be punished by death or life imprisonment.

18 U.S.C. § 2113(a), (d), (e). Section 924(c)(3)(A) defines a "crime of violence" as "an offense that is a felony and — (A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another." One of the elements of bank robbery is a taking "by force and violence, or by intimidation." § 2113(a). The elements of bank robbery under § 2113(a) are not broader than the conduct covered under § 924(c)(3)(A). *Compare* § 2113(a) *with* § 924(c)(3)(A). Bank robbery thus qualifies as a crime of violence under the categorical approach.

This conclusion is consistent with binding Ninth Circuit precedent. As the government pointed out, the Ninth Circuit has found that both bank robbery and armed bank robbery qualify as crimes of violence under § 924(c)(3)(A).

In *United States v. Wright*, 215 F.3d 1020 (9th Cir. 2000), the Ninth Circuit examined whether armed robbery in violation of 18 U.S.C. §§ 2113(a) and 2113(d) qualifies as a crime of violence to serve as the predicate offense for a violation of

§ 924(c). The defendant in that case was charged and found guilty of armed bank robbery in violation of 18 U.S.C. §§ 2113(a) and 2113(d), using or carrying a firearm during a crime of violence in violation of 18 U.S.C. § 924(c) and conspiracy. The court considered § 924(c)(3)'s definition of a crime of violence — "a felony that 'has as an element the use, attempted use, or threatened use of physical force against the person or property of another,'" 215 F.3d at 1028 (quoting § 924(c)(3)) — and found that armed bank robbery "qualifies as a crime of violence because one of the elements of the offense is a taking by 'force and violence, or by intimidation." *Id.* (quoting § 2113(a)). McDuffy argues that *Wright* "adds nothing" because it predates *Johnson* and other decisions, but *Wright* has not been overruled or abrogated. *See United States v. Watson*, CR No. 14-00751-01 DKW, 2016 WL 866298, at *6 (D. Haw. Mar. 2, 2016).

In an earlier decision, *United States v. Selfa*, 918 F.2d 749 (9th Cir. 1990), the Ninth Circuit considered the defendant's challenge to a finding that his prior two bank robbery convictions in violation of 18 U.S.C. § 2113(a) qualify as crimes of violence under Sentencing Guidelines § 4B1.1. This section defines the term "crime of violence" in pertinent part as "any offense under federal or state law punishable by imprisonment for a term exceeding one year that — (i) has as an element the use, attempted use, or threatened use of physical force against the person of another."[3] U.S.S.G. § 4B1.2(a)(1). The court observed that it "has defined 'intimidation' under section 2113(a) to mean 'wilfully to take, or attempt to take, in such a way that would put an ordinary, reasonable person in fear of bodily harm.'" *Selfa*, 918 F.2d at 751 (quoting *United States v. Hopkins*, 703 F.2d 1102, 1102 (9th Cir. 1983). The court concluded that "persons convicted of robbing a bank 'by force or violence' or 'intimidation' under 18

///

---

[3]U.S.S.G. § 4B1.2(a)(1) is almost identical to 18 U.S.C. § 924(c)(3)(A). *Compare* U.S.S.G. § 4B1.2(a)(1) (defining a crime of violence, in part, as having "as an element the use, attempted use, or threatened use of physical force against the person of another") *with* 18 U.S.C. § 924(c)(3)(A) (a crime of violence is a felony that "has as an element the use, attempted use, or threatened use of physical force against the person or property of another").

1  U.S.C. § 2113(a) have been convicted of a 'crime of violence' within the meaning of
2  Guideline Section 4B1.1." *Selfa*, 918 F.2d at 751.

3       McDuffy insists that the crime of violence in count two is not the bank robbery
4  with a dangerous weapon resulting in death but is, more specifically, the "resulting in
5  death" in violation of § 2113(e). McDuffy argues that the elements of § 2113(e) involve a
6  killing that does not require any intent because the killing could be reckless or
7  accidental, and is broader than a crime of violence under § 924(j)(1), which requires a
8  killing to be intentional. The government counters that bank robbery with a dangerous
9  weapon resulting in death falls under the felony murder subsection of 18 U.S.C. § 1111
10 because the intent is the intent to commit the robbery. The parties, however, seem to
11 conflate the predicate crime of violence with the elements required to establish an
12 offense under § 924(j)(1).

13      Section 924(j)(1) requires as an element a predicate "crime of violence," as that
14 term is defined in § 924(c)(3)(A). *See* § 924(j)(1) ("A person who, in the course of a
15 violation of subsection (c), causes the death of a person through the use of a firearm,
16 shall — (1) if the killing is a murder (as defined in section 1111), be punished by death
17 or by imprisonment for a term of years or for life."). Bank robbery qualifies as a crime of
18 violence under § 924(c)(3)(A). *See* discussion *supra.* Whether § 924(j)(1) itself qualifies
19 as a crime of violence is of no import to the determination of whether the predicate
20 crime qualifies as a crime of violence. The *mens rea* required to establish felony murder
21 under § 1111 is similarly not relevant to the determination of whether the predicate
22 offense — bank robbery — qualifies as a crime of violence under § 924(c)(3)(A). For
23 this same reason, McDuffy's additional argument regarding § 924(c)(3)(A) — that bank
24 robbery with a dangerous weapon resulting in death is not a categorical crime of
25 violence under § 924(c)(3)(A) because the offense need not involve intentional killing —
26 is tenuous.

27 ///

28 ///

7

In sum, the Court finds that the predicate offense in count two — bank robbery with a dangerous weapon resulting in death — qualifies as a crime of violence under 18 U.S.C. § 924(c)(3)(A). McDuffy's Motion to Dismiss this count is denied.

## IV.    MOTION RE SPECIFIC INTENT

McDuffy asks the Court to recognize that 18 U.S.C. § 2113(e), in count one of the indictment, involves a specific intent *mens rea* requirement, and that evidence of intoxication or diminished capacity is therefore relevant to an ultimate determination of guilt. McDuffy also argues that the government is required to prove he acted with malice aforethought. (ECF No. 45.) The government responds that § 2113(e) — bank robbery with a dangerous weapon resulting in death — is a general intent crime, and as such the government is only required to show that McDuffy had the general intent to commit the underlying bank robbery. (ECF No. 56.)

18 U.S.C. § 2113 is a federal criminal statute addressing bank robbery "and specifies the applicable criminal sanctions." *United States v. Jones*, 678 F.2d 102, 103-04 (9th Cir. 1982). The statute is divided into several subsections. Subsection (a) defines the offense of bank robbery and provides for the imposition of a fine and/or imprisonment of no more than twenty years. Subsections (d) and (e) proscribe the same conduct in subsection (a), but provide "enhanced punishment for bank robberies in which there is 'aggravating' conduct in addition to the basic § 2113(a) offense." *Id* at 104. Subsection (d) increases the minimum penalty for anyone who commits bank robbery and "assaults any person, or puts in jeopardy the life of any person by the use of a dangerous weapon or device." 18 U.S.C. § 2113(d). Subsection (e) increases the minimum penalty, and makes the death penalty available for anyone who commits bank robbery and "kills any person." 18 U.S.C. § 2113(e).

As the Supreme Court has observed, the distinction between specific intent and general intent in criminal law is "the source of a good deal of confusion." *United States v. Bailey*, 444 U.S. 394, 403 (1980). Broadly, if a crime does not include a *mens rea* requirement — such as knowingly or maliciously — the crime may be considered one of

general intent, meaning the defendant need only have intended to commit the *actus reas*. *See* 1 Subst. Crim. L. § 5.1 (2d ed.). While this might seem like a matter of semantics, a crime that is considered a specific intent crime often requires the government to prove an additional element. And importantly, "[t]he practical difference between these two levels of mental culpability is that certain defenses, such as voluntary intoxication and subjective mistake of fact, can negate culpability only for specific intent crimes." *United States v. Gracidas-Ulibarry*, 231 F.3d 1188, 1196 (9th Cir. 2000).

Section 2113(a) does not contain a *mens rea* requirement on its face. Unsurprisingly, the Ninth Circuit, and other courts, have clearly indicated that bank robbery is a general intent crime. *See United States v. Burdeau*, 168 F.3d 352, 356 (9th Cir. 1999); *United States v. Durham*, 645 F.3d 883, 891 (7th Cir. 2011).

McDuffy's argument, however, is more nuanced. He argues that subsection (e) of the statute, which imposes a mandatory life sentence and makes the death penalty available if the robber kills another person in relation to the robbery, should be understood differently than the simple definition of bank robbery in subsection (a). Because it is a species of felony murder, he argues, it should be interpreted like first degree murder in 18 U.S.C. § 1111. Section 1111 is the federal criminal statute defining murder as "the unlawful killing of a human being with malice aforethought;" it further explains that "[e]very murder . . . committed in the perpetration of . . . robbery . . . is murder in the first degree." In other words, while McDuffy agrees that § 2113(a), the basic crime of bank robbery, requires only general intent, once the government seeks the enhanced penalties in § 2113(e), he believes the government is required to show specific intent.

McDuffy relies on *United States v. Lilly*, 512 F.2d 1259 (1975) as support. In *Lilly*, the Ninth Circuit held that when the government relies on the underlying crime of robbery (a general intent crime) to charge a defendant with felony murder under § 1111, ///

9

the government is required to show specific intent.[4] This is because when the federal murder statute was drafted in 1909, the crime of robbery was a specific intent rather than a general intent crime. *Id.* at 1261. Robbery was redefined in 1948, and in the process it was changed to a general intent crime. *Id.* Therefore, the court reasoned, in order to fulfill the malice aforethought requirement for murder (which in a felony murder is replaced by the specific intent to commit the underlying felony), the statute must be understood to require specific intent. *Id.* The court "conclude[d] that specific intent remains an element of robbery as used in § 1111." *Id.*

The court explicitly stated that its conclusion only reached "robbery as that term is used in § 1111." *Id.* Nonetheless, McDuffy argues that the same reasoning is applicable to § 2113(e). The government counters that *Lilly* was clearly confined to § 1111, and that the Ninth Circuit model jury instructions for § 2113(e) indicate that they need only show general intent.[5] The government further argues that malice aforethought includes intent to commit a felony in the context of felony murder.

Section 2113(e), on its face, does not require any element of *mens rea* beyond § 2113(a). While § 2113(e) may cover behavior similar to (or even the same as) felony murder, it is not felony murder, but rather an enhanced version of bank robbery.[6] Thus, *Lilly* is distinguishable. *Lilly* addressed the stand-alone crime of murder in violation of § 1111, albeit murder "committed in the perpetration of, or attempt to perpetrate . . . robbery." 18 U.S.C. § 1111. As the court explained, if the term robbery as used in

///

---

[4]Count two does incorporate the elements of § 1111; thus, the holding in *Lilly* applies to count two.

[5]The persuasive value of jury instructions in a case like this is limited. "Jury instructions do not come down from any mountain or rise up from any sea. Their precise wording, although extremely useful, is not blessed with any special precedential or binding authority." *McDowell v. Calderon*, 130 F.3d 833, 840 (9th Cir. 1997) (en banc), *overruled in part on other grounds by Weeks v. Angelone*, 528 U.S. 225 (2000).

[6]The Court recognizes that § 1111 and § 2113(e) impose the same penalties for similar (or even the same) conduct, and for that reason, McDuffy's argument carries some persuasion. Ultimately, however, they are separate crimes and it is not the Court's place to second guess the legislature's policy judgements in regards to sentencing, as long as it is within constitutional bounds.

§ 1111 "does not require specific intent, the extraordinary result would be that first-degree murder, the essence of which historically has been cold-blooded premeditation in the nature of poisoning or lying in wait, could, as federal felony murder, be committed without specific intent to commit any crime at all." *Lilly*, 512 F.2d at 621. Section 2113(e) does not present this defect because § 2113(e) is not a stand-alone crime, but rather "provides enhanced punishment for bank robberies in which there is 'aggravating' conduct in addition to the basic § 2113(a) offense." *Jones*, 678 F.2d at 104 (noting the "interaction of the subsections of § 2113"). Subsection (e) uses the word "kills" rather than "murders," and the additional element of killing does not introduce any additional mental element.[7] Nor does it introduce the same problem encountered in *Lilly*. As the Ninth Circuit noted in dicta in *Jones,* "[t]he 'essential elements' of subsection (e) are the commission of a robbery and the killing or kidnapping in connection with it." *Id.* at 105; *see also United States v. Jackson*, 756 F.2d 703, 706 (9th Cir. 1985) ("The essential elements of 18 U.S.C. § 2113(e) are the commission of a robbery and a killing or kidnapping in connection with it." (citing *Jones*, 678 F.2d at 105)).

McDuffy also relies on *Jones*, 678 F.2d at 106, where, according to McDuffy, the court "held that a defendant must have specific intent to aid and abet the killing." (ECF No. 45 at 8.) However, the *Jones* court did not so hold. In that case, the court held: "The 'essential elements' of subsection (e) are the commission of a robbery and the killing or kidnapping in connection with it. The accomplice must aid and abet each of these essential elements." *Jones*, 678 F.2d at 106. The *Jones* court did not find that an accomplice must have the specific intent to aid and abet the killing. In fact, *Jones* compels the finding that § 2113(e) does not add a specific intent element by its holding that the two elements are (1) "the commission of a robbery" and (2) "the killing or kidnapping in connection with it." *Id.*

///

---

[7]Though, as McDuffy correctly points out, courts have not been precise in their word choice when discussing the statute. *See, e.g., Jackson*, 756 F.2d at 705-06 (court uses "murder" and "killing" interchangeably in addressing § 2113(e)).

Therefore, the Court finds that § 2113(e) is a crime of general intent just like § 2113(a). McDuffy's motion to recognize the specific intent *mens rea* is denied.[8]

## V.    MOTION TO SUPPRESS

### A.    Introduction

Fifty years ago, in *Miranda v. Arizona*, 384 U.S. 436, 439 (1966), the Supreme Court adopted certain procedural safeguards to ensure that an individual who is "subjected to custodial police interrogation . . . is accorded his privilege under the Fifth Amendment to the Constitution not to be compelled to incriminate himself."[9] Absent those safeguards, the government may not use statements obtained from the "custodial interrogation." *Id.* at 444. "Those safeguards included the now familiar *Miranda* warnings — namely, that the defendant be informed 'that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires' — or their equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 297 (1980) (quoting *Miranda*, 384 U.S. at 479).

McDuffy seeks to suppress the following evidence: (1) statements made before he was advised of his *Miranda* rights; (2) statements made after McDuffy waived his *Miranda* rights; and (3) evidence obtained from McDuffy's residence and storage unit. (ECF No. 46 at 1-2.) McDuffy contends that the waiver of his *Miranda* rights was ineffective because the government inadequately advised him of his rights and because he has a history of mental illness. He further argues that his confessions were involuntary because of his mental illness.

///

///

---

[8]In his reply brief, McDuffy contends that evidence of diminished condition will be admissible if the Court declines to suppress his statements. (ECF No. 65 at 5.) The Court declines to address this issue since it was not properly raised and is more properly raised in a motion in limine.

[9]*Miranda* was decided on June 13, 1966. *Miranda*, 384 U.S. 436. Coincidentally, the first part of the evidentiary hearing was held on June 13, 2016. (ECF No. 69.)

### B.    Relevant Facts

The facts and events relating to McDuffy's interrogation are captured on the Video and are not much in dispute. McDuffy was held in handcuffs inside a room at RPD's homicide unit. The Video captures about 46 minutes during which Foremaster converses with McDuffy on various topics relating to their backgrounds, including: McDuffy's service in the Marine Corps, what he did since then, where he resided in Reno, whether he had any children, how controlled substances affected one of McDuffy's prior romantic relationships, what kinds of drugs he used, and whether McDuffy had been to the jail in the area before. (Gov't Exh. 1 at 00:00-46:21; ECF No. 46-1 at 3-21.) About 46 minutes into the Video, Taylor and Millsap entered the room and Foremaster left. (*Id.*) The Officers asked questions of McDuffy for about 10 minutes before Taylor informed McDuffy of his *Miranda* rights. (Gov't Exh. 1 at 46:22-57:00; ECF No. 46-1 at 21-29.) The questions asked cover basic information, including McDuffy's name, date of birth, social security number and place of birth, and information that goes beyond the basics, including what brought McDuffy to Reno, where he resides in Reno and with whom, and his employment and family background. (ECF No. 46-1 at 22-28.)

After McDuffy waived his *Miranda* rights, Millsap said, "Let's start with what happened today."[10] (*Id.* at 30.) McDuffy responded: "What happened . . . I . . . I been getting high a bit and stuff you know . . . I tried to rob a bank in the process I asked this guy not to interfere . . . I shot him . . . sorry about that I didn't mean to, then I tried to get away." (*Id.* at 30.) Millsap proceeded to ask follow up questions. (*Id.* at 30-47.) They left the room and Millsap told McDuffy that either Foremaster or someone else would come into the room to accompany McDuffy. (*Id.* at 46.) McDuffy was left alone with the door open for about a minute before Foremaster returned. (Gov't Exh. 1 at 1:29.) Foremaster sat with McDuffy for about 12 minutes before Millsap and Taylor returned; they ///

---

[10]Millsap asked most of the questions while Taylor asked some follow-up questions.

13

proceeded to ask McDuffy additional questions for approximately 45 more minutes. (*Id.* at 1:42-2:27.) McDuffy was eventually processed for booking.

Both Taylor and Millsap testified that McDuffy's demeanor was calm and his answers were coherent. The Video supports their observation of McDuffy's calm demeanor. (Gov't Exh. 1.) The government does not dispute, however, that McDuffy has a history of documented mental illness, including schizophrenia. At the evidentiary hearing, Dr. Shaffer reiterated the findings in his expert report — that the results of the various assessment tests he administered to McDuffy support McDuffy's diagnoses of schizophrenia, major neurocognitive disorder, and moderate alcohol use disorder. (ECF No. 48, App. D at 8.) He also reiterated his opinion that McDuffy's "ability to appreciate the consequences of actions is significantly impaired." (*Id.* at 6.)

## C.   Statements Before Waiver of *Miranda* Rights

The government concedes that McDuffy "was in custody so the constitutional safeguards of *Miranda* apply" (ECF No. 57 at 2), but argues that none of the exchanges before McDuffy was advised of his *Miranda* rights related to the case or "could be interpreted as attempting to elicit an incriminating response" from McDuffy. (*Id.* at 4.) McDuffy counters that Foremaster's questions were of the types that law enforcement officers should know may elicit incriminating responses.

The parties' disagreement centers on whether the pre-*Miranda*-warning questioning amounts to an interrogation. As the Supreme Court explained:

> [T]he term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police

14

officers that they *should have known* were reasonably likely to elicit an incriminating response.

*Innis*, 446 U.S. at 301-02.

First, it is important to describe the set-up of the room where McDuffy was detained. The room appears to be an office of some sort. (Gov't Exh. 1.) McDuffy sat next to a desk with his hands held in handcuffs behind his back. Foremaster sat on one side of the desk but in close proximity to McDuffy. Throughout their exchange, Foremaster helped wipe fluids from McDuffy's nose.[11] During many moments of pauses, Foremaster would reinitiate the conversations. Foremaster asked McDuffy questions about his service in the Marine Corps, what he did since then, where he resided in Reno, whether he had any children, what kinds of drugs he used after McDuffy shared information about how controlled substances affected a prior romantic relationship, and whether McDuffy had been to the jail in the area before. (ECF No. 46-1 at 3-21.) Foremaster's questions went beyond polite conversation, let alone "those normally attendant to arrest and custody." *Innis*, 446 U.S. at 301. The Video shows that Foremaster was developing a rapport with McDuffy. Foremaster, for example, told McDuffy that he is about the same age as Foremaster's father, for whom Foremaster had obvious respect. (ECF No. 46-1 at 14-17.) They discussed the importance of family generally. (*Id.* at 16-17.) Foremaster also told McDuffy about the difficulty of overcoming a drug addiction after McDuffy shared that he had given up drug use. (*Id.* at 19.)

McDuffy concedes that there is no evidence that the information obtained by Foremaster was conveyed to the Officers for them to use in their interrogation. Taylor and Millsap separately testified that they did not talk to Foremaster and did not know the content of his conversation with McDuffy. While others outside the interrogation room observed McDuffy's interrogation, there is no evidence that they observed Foremaster's ///

---

[11]Foremaster's gestures appear to be genuine although the Court notes that his intent is not pertinent.

interactions with McDuffy, or that the content of Foremaster's exchange with McDuffy was relayed to the Officers for use in their interrogation.

The government argues that Foremaster accompanied McDuffy because RPD was concerned about the potential destruction of evidence. The Video supports this argument — Foremaster returned to the room when Taylor and Millsap took a break to go over McDuffy's answers, and McDuffy was left alone only after RPD had obtained his personal items and had him change out of his street clothes. While there were other options available for observing McDuffy — such as observing him from outside the room because the room was apparently set up for that purpose — the Court cannot find that law enforcement should have known that the method selected (i.e., having a detective sit with McDuffy) was reasonably likely to elicit an incriminating response.

Thus, the question of whether Foremaster's pre-*Miranda* interactions with McDuffy amount to an interrogation presents a close call. Because the government has indicated that the statements McDuffy made before he was given his *Miranda* rights are not relevant and will not be offered at trial (ECF No. 57 at 4), this issue is rendered moot. The Court will address this issue in the event it is raised during trial.

### D.   Waiver of *Miranda* Rights

McDuffy confessed after he waived his *Miranda* rights. McDuffy argues that because law enforcement failed to adequately inform him of his *Miranda* rights, and because he did not voluntarily waive his right to self-incrimination, his post-waiver statements should be excluded. McDuffy's arguments are premised primarily on his characteristics — specifically, his undisputed history of mental illness — and law enforcement's conduct.

"For inculpatory statements made by a defendant during custodial interrogation to be admissible in evidence, the defendant's waiver of *Miranda* rights must be voluntary, knowing, and intelligent." *United States v. Garibay*, 143 F.3d 534, 536 (9th Cir. 1998) (quotation marks omitted). The determination of whether a waiver was valid "depends upon the totality of the circumstances including the background, experience,

and conduct of [the] defendant." *Id.* (quotation marks omitted). "There is a presumption against waiver . . . which the Government bears the burden of overcoming by a preponderance of the evidence." *United States v. Crews*, 502 F.3d 1130, 1139-40 (9th Cir. 2007).

In *Moran v. Burbine,* 475 U.S. 412, 421 (1986), the Supreme Court clarified the standard for determining whether the waiver of *Miranda* rights is effectuated:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Id.* at 421 (citations omitted). The Court also noted that "the state of mind of the police is irrelevant to the question of the intelligence and voluntariness of respondent's election to abandon his rights." *Id.* at 423. In *Colorado v. Connelly*, 479 U.S. 157, 170 (1986), the Supreme Court declined to "find an attempted waiver invalid whenever the defendant feels compelled to waive his rights by reason of any compulsion." The Court noted that "*Miranda* protects defendants against government coercion leading them to surrender rights protected by the Fifth Amendment; it goes no further than that." *Id.*

McDuffy contends both *Moran* factors are implicated. However, because McDuffy relies on his mental illness to challenge the voluntariness factor and the voluntariness of his confession, the Court will address the voluntariness aspect in concert with his confession in the next section.[12]

---

[12]In *Connelly,* the Supreme Court explained the similarities in the voluntariness inquiry:

> There is obviously no reason to require more in the way of a "voluntariness" inquiry in the *Miranda* waiver context than in the Fourteenth Amendment confession context. The sole concern of the Fifth Amendment, on which *Miranda* was based, is governmental coercion. . . . The voluntariness of a waiver of this privilege has always depended on the absence of police overreaching, not on "free choice" in any broader sense of the word.

*Connelly*, 479 U.S. at 169-70 (citations omitted).

1      In terms of the second factor, McDuffy argues that his waiver was not made with

2  full awareness because Taylor did not adequately inform McDuffy of his rights, McDuffy

3  had told the Officers that he used meth the night before, and the Officers withheld

4  information about the victim's death until the conclusion of the interrogation. He takes

5  issue with the speed with which Taylor read McDuffy his rights and the fact that neither

6  officer asked McDuffy to initial each line of the waiver form to make sure he understood

7  his rights. McDuffy also points to his history of mental illness, including Dr. Shaffer's

8  opinion that McDuffy suffers from schizophrenia and neurocognitive disorder, and his

9  recent use of meth, to argue that his waiver was not made with full awareness of his

10  rights.

11      However, there is no evidence that McDuffy did not understand his *Miranda*

12  rights because Taylor read them too fast or because he was not asked to sign the

13  advice of rights form line by line. As the government pointed out, Taylor read McDuffy

14  his *Miranda* rights and asked if he consented. McDuffy responded "yes." (ECF No. 46-1

15  at 29.) McDuffy was given the advice of rights form to sign, which he did. McDuffy did

16  not ask any questions, nor did he indicate that he did not understand his *Miranda* rights.

17  In fact, before Taylor read the *Miranda* warnings, Millsap asked McDuffy if he had heard

18  his rights before, to which McDuffy responded "yes, yes I have." (*Id.*) At no time during

19  these exchanges or during the interrogation did McDuffy indicate that he did not

20  understand his rights or that he wished to exercise his right to remain silent or to ask for

21  an attorney. Moreover, McDuffy carried on a detailed conversation with Foremaster

22  about his background. He gave detailed information to the Officers, including

23  information about when he planned the robbery, how he selected the particular bank,

24  what he did the night before in addition to using meth, how he obtained the gun from

25  storage, what he did in terms of his transportation to the storage unit and to the Bank,

26  and the events at the Bank. (ECF No. 46-1 at 30-46, 52-61.) The government

27  ///

28  ///

1   introduced evidence to show that McDuffy was current with his risperidone medication

2   at the time of the interrogation.[13] (ECF No. 57-2.)

3        Dr. Shaffer opined that McDuffy's "ability to appreciate the consequences of

4   actions is significantly impaired." (ECF No. 48, App. D at 6.) However, on cross-

5   examination, he acknowledged that McDuffy's response to Millsap's general comment

6   of "Let's start with what happened today" shows an understanding of what happened

7   and what McDuffy did.[14] He also testified that McDuffy appreciates some cause and

8   effect, as exhibited in his planning of the robbery. The planning, however, was

9   "primitive" and did not involve a complex scheme.

10        Looking at the totality of the circumstances, the Court finds that the government

11   has demonstrated by a preponderance of the evidence that the second factor is

12   satisfied. Dr. Shaffer testified that McDuffy has an understanding of some

13   consequences of his actions, and his difficulty has to do with novel situations. But

14   McDuffy indicated to the Officers that he had heard *Miranda* rights before, and, after

15   being read his rights, he agreed to waive them. Dr. Shaffter's testimony thus supports a

16   finding that McDuffy understood the consequences of his waiver of his *Miranda* rights.

17   McDuffy's waiver was made with a full understanding of the nature of his rights and the

18   consequences of his decision to relinquish his rights. The second factor — the

19   voluntariness of McDuffy's waiver — is also satisfied, as discussed below.

20       **E.   Voluntariness of McDuffy's Confession**

21        Recently, in *United States v. Preston*, 751 F.3d 1008 (9th Cir. 2014) (en banc),

22   the Ninth Circuit clarified the standard for determining the voluntariness of a confession.

23   It reminded courts to focus on "'whether the defendant's will was overborne by the

24       [13]McDuffy received bi-monthly risperidone injections for treatment of his mental

25   illness. Dr. Shaffer testified that when the medication is working properly, the individual
is not as agitated, but it is difficult to evaluate whether the medication worked properly

26   without knowing more about the individual's other health and habits — hours of sleep,
diet, etc.

27       [14]Dr. Shaffer explained on re-direct that the various tests that he administered to

28   McDuffy relate to "novel situations that come up in the moment, and not things that have
happened in the past," and in situations where "interpersonal influence" exists.

circumstances surrounding the giving of [the] confession,' an inquiry that 'takes into consideration the totality of all the surrounding circumstances — *both* the characteristics of the accused *and* the details of the interrogation.'" *Preston*, 751 F.3d at 1016 (quoting *Dickerson v. United States*, 530 U.S. 428, 434 (2000)) (alteration in original). "Each of these factors, in company with all of the surrounding circumstances — the duration and conditions of detention (if the confessor has been detained), the manifest attitude of the police toward him, his physical and mental state, the diverse pressures which sap or sustain his powers of resistance and self-control — is relevant." *Id.* (quoting *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961)). Thus, the voluntariness inquiry "is not limited to instances in which the claim is that the police conduct was 'inherently coercive,'" *Miller v. Fenton*, 474 U.S. 104, 110 (1985) (quoting *Ashcraft v. Tennessee*, 322 U.S. 143, 154, (1944)), but "applies equally when the interrogation techniques were improper only because, in the particular circumstances of the case, the confession is unlikely to have been the product of a free and rational will." *Id.* (citing *Mincey v. Arizona*, 437 U.S. 385, 401, (1978)). Moreover, "although low intelligence does not categorically make a confession involuntary, it is 'relevant . . . in establishing a setting' in which police coercion may overcome the will of a suspect." *Preston*, 751 F.3d at 1016 (quoting *Procunier v. Atchley*, 400 U.S. 446, 453-54 (1971)) (alteration in original). Finally, "courts must 'weigh, rather than simply list,' the relevant circumstances, and weigh them not in the abstract but 'against the power of resistance of the person confessing.'" *Id.* at 1018 (quoting *Doody v. Ryan*, 649 F.3d 986, 1015-16 (9th Cir. 2011) (en banc)). The government bears the burden of proving the voluntariness of a statement by a preponderance of the evidence. *Lego v. Twomey*, 404 U.S. 477, 489 (1972). Considering "the totality of all the surrounding circumstances," the Court does not find that McDuffy's confession was involuntary. *Preston*, 751 F.3d at 1016.

McDuffy contends that the "combination of his schizophrenia, neurocognitive disorder and substance abuse are all factors that foreclose the government from proving that his custodial interrogation statements were the product of a rational mind

and made with free will." (ECF No. 46 at 10-11.) McDuffy correctly describes the evidence as to his character that weighs against a finding of voluntariness. McDuffy informed the Officers that he used crystal meth the evening before the bank robbery. The government does not dispute that McDuffy has a history of mental illness; nor does it challenge McDuffy's diagnosis of schizophrenia, major neurocognitive disorder, and moderate alcohol use disorder. Dr. Shaffer testified that McDuffy was vulnerable to suggestive questioning, particularly when law enforcement utilized a deceptive questioning technique as it did here by establishing an emotional connection with McDuffy first before the Officers questioned him. He further testified that any negative symptoms would not be apparent.

McDuffy also argues that the nature of Foremaster's and the Officers' questioning shows coercion through manipulation, which consisted of first establishing a rapport through Foremaster's interactions with McDuffy for about 45 minutes. The Officers then moved into the interrogation phase, where the interrogators claimed they wanted to be honest with McDuffy, asked leading questions, and withheld crucial information about the death of the victim.

The Supreme Court "has recognized that coercion can be mental as well as physical." *Blackburn v. Alabama*, 361 U.S. 199, 206 (1960). "Coercive police activity is a necessary predicate to a finding of a confession involuntary." *United States v. Kelley*, 953 F.2d 562, 565 (9th Cir. 1992) (quoting Colorado v. Connelly, 479 U.S. 157, 167 (1986)). And "psychological persuasion" is a type of coercive activity. *Id.*

Here, law enforcement did apply mental coercion.[15] First, Foremaster established a rapport with McDuffy in their 45 minute exchange, during which he talked about

_____

[15]The parties argue over whether *Blackburn* and *Connelly* are analogous to this case. Both cases are factually distinguishable. In *Blackburn*, the Supreme Court found that the defendant's confession was involuntary because "the evidence indisputably establishes the strongest probability that Blackburn was insane and incompetent at the time he allegedly confessed" and law enforcement's conduct, including the fact that they interrogated Blackburn for a sustained 8 to 9 hours in small room that was at times filled with police officers, was coercive. *Blackburn v. Alabama*, 361 U.S. 199, 207 (1960). McDuffy does not contend that he was insane at the time of the offense or his *(fn. cont...)*

personal topics, including service in the Marines, family, drug use, and overcoming addiction. (Gov't Exh. 1 at 00:00 to 46:24; ECF No. 46-1 at 3-21.) Second, the decision to delay informing McDuffy of the victim's death was calculated. Millsap testified that the point at which he informs the suspect of a victim's death depends on the circumstances involved. In this case, he did not inform McDuffy of the victim's death until after he obtained McDuffy's full confession. Third, the Officers asked several leading questions. For example Millsap is the first to introduce the idea that McDuffy compared the security of other banks (ECF No. 46-1 at 38), and the first to introduce the idea that one of the first things McDuffy would do with the money would be to buy more drugs. (*Id.* at 60.) McDuffy's responses to some of the questions provided clues as to his mental illness. For example, McDuffy shared that he has a pension with the Marines, that he has a payee who paid the storage unit's rent, and that he would go to "the hospital for meetings to see a psychiatrist." (ECF No. 46-1 at 27-28, 33-34, 67.) Finally, Millsap delayed telling McDuffy of the victim's death despite telling McDuffy that he would "be completely honest with" McDuffy. (*Id* at 29.)

Despite evidence of mental coercion, the evidence supports a finding of voluntariness when the nature of the interrogation is considered. Even assuming that the interrogation started with Foremaster's exchange with McDuffy, the interrogation lasted a total of about 2 hours. (Gov't. Exh. 1.) Foremaster may have attempted to establish rapport and to gain McDuffy's trust, but his behavior did not show that he used

---

(…fn. cont.)

confession. Moreover, even counting the interactions with Foremaster, the interrogation was about 2 hours and involved a total of three law enforcement officers. In *Connelly*, the defendant approached the first officer and, without any prompting, confessed to a murder. In response, the officer immediately gave the defendant his *Miranda* rights, which the defendant indicated he understood before he continued to talk about the killing. *Connelly*, 479 U.S. at 160. Other officers who arrived on the scene went through the same routine with the defendant, who insisted on confessing and took them to the scene of the murder. *Id.* at 160-61. Defendant later indicated that he was following the direction of the "voices" that told him to confess. *Id.* at 161. Unlike *Connelly*, McDuffy did not approach law enforcement without prompting; he confessed during an interrogation. Moreover, McDuffy argues that his confession is the result of coercive police conduct, whereas the lower court in *Connelly* had found the police did not engage in any wrongful or coercive conduct in obtaining the defendant's confession. *Id.* at 162.

this relationship to overpower McDuffy's will. The Officers' attitudes appear to be similarly benign. When the Officers began their interrogation, they asked McDuffy if he was comfortable and when he responded that his hands were stiff, they changed the positioning of his handcuffs. (*Id.* at 46:41 to 52:58.) They also got him water. (*Id.*) Foremaster did not ask McDuffy any questions relating to the offense during their 45 minutes of conversation. About an hour later — and 10 minutes into the Officers' interrogation — McDuffy confessed. There is no evidence that the Officers openly took advantage of McDuffy's mental illness or vulnerabilities in order to overpower his will. While Dr. Shaffer testified that McDuffy was susceptible to suggestive questioning, particularly when law enforcement utilized a deceptive questioning technique, he also testified that any negative symptoms would not be apparent. McDuffy confessed after Millsap said, "Let's start with what happened today." (ECF No. 46-1 at 29-30.)

> McDuffy: What happened . . . I . . . I been getting high a bit and stuff you know . . . I tried to rob a bank in the process I asked this guy not to interfere . . . I shot him . . . sorry about that I didn't mean to, then I tried to get away.
>
> Millsap: Um, hum.
>
> McDuffy: I had a ride with a taxi but it pulled out so I ran over to the bus to try to get a ride on the bus.
>
> Millsap: Okay.
>
> McDuffy: I think this off duty police officer apprehended me in the process.
>
> Millsap: Okay, did you fight him at all?
>
> McDuffy: No . . .

(*Id.* at 30.)

After McDuffy explained what he did the evening before — getting high and watching TV — Millsap continued with an open ended question.

> Millsap: Can you walk me through from the time you got up, tell me what you did.
>
> McDuffy: I . . . I . . . I . . . went [inaudible] and got the gun.

| | | |
|---|---|---|
| Millsap: | I'm sorry you got the gun. | |
| McDuffy: | Yes . . . yes I had it in the storage unit. | |
| Millsap: | Where is that storage unit at? | |
| McDuffy: | On Valley . . . | |
| Millsap: | By the UNR area? | |
| McDuffy: | Yes. | |
| Millsap: | How did you get there? | |
| McDuffy: | Caught . . . caught the bus. | |
| Millsap: | Do you know the name of the storage unit facility? | |
| McDuffy: | I think it's A-1 Storage. | |
| Millsap: | Okay . . . so you took a bus up there do you know what bus you hit? | |
| McDuffy: | 8:30 around in there. | |
| Millsap: | Where did you catch it at? | |
| McDuffy: | I caught it on Virginia Street, went downtown . . . | |
| Millsap: | Let me ask you when you woke up did you know what you were going to do today? | |
| McDuffy: | I had started planning that because I was running out of money so . . . I kept wanting to get high. | |
| Millsap: | Okay, when did you start planning this? | |
| McDuffy: | Last night I thought about it about a week or so before, last night I made up my mind to do it. | |

(*Id.* at 32.)

Millsap continued with several more open-ended questions about "what happens next":

| | | |
|---|---|---|
| Millsap: | So after you get the gun what happens next? | |
| McDuffy: | I rode over to where the taxi [inaudible] was, I got a taxi to drive me over to the bank. | |
| Millsap: | Okay so how do you get from the storage unit to the taxi? | |
| McDuffy: | Bus. | |

(*Id.* at 36.)

| | | |
|---|---|---|
| 1 | Millsap: | No, okay, all right. All right so walk me through what happens from the time you get into the bank? |
| 2 | | |
| 3 | McDuffy: | I went in there, went up to the teller windows and stuff and I gave them my bag and this one guy kept . . . I told why she put it because this is the bag but he kept . . . get out of here, get out of here and like he started moving toward me so . . . that's when I reacted, got the . . . [inaudible] then after that the other teller bag and then the other window then I took off, I was about to try to get the taxi but what happened inside and drove off. |
| 4 | | |
| 5 | | |
| 6 | | |
| 7 | (*Id.* at 39.) | |
| 8 | Millsap: | Okay, so do you get any money before the gentleman kind of interrupts you? |
| 9 | | |
| 10 | McDuffy: | He interfered from me getting the money . . . |
| 11 | Millsap: | Okay. |
| 12 | McDuffy: | He tried to run me off, I told him to watch it, he kept advancing. |
| 13 | Millsap: | Can you describe that gentleman to me? |
| 14 | McDuffy: | Older guy, white, maybe close to my age. |
| 15 | Millsap: | Okay and you are . . . how old are you, sir? |
| 16 | McDuffy: | I'm 66, he might have been in his 50's. |
| 17 | Millsap: | Did you say anything to him? |
| 18 | McDuffy: | I told him to get back, get out of the way because I had a weapon, he ignored that. |
| 19 | | |
| 20 | Millsap: | Did you have it pointed at him or was it still down . . . |
| 21 | McDuffy: | It was kind of down when he started interfering getting the money from . . . that's when I fired. |
| 22 | Millsap: | Okay, do you know how many times you shot? |
| 23 | McDuffy: | One time. |
| 24 | Millsap: | Do you know if you hit him? |
| 25 | McDuffy: | I think I might have hit him. |
| 26 | | * * * |
| 27 | Millsap: | What happened after you shot him? |
| 28 | | |

McDuffy:    I grabbed the money and went to the other teller, she was crouched down, I told her to give me the money out of the drawer, she gave it to me then I proceeded to get out of the bank.

(*Id.* at 41, 42.)

The evidence also supports a finding of voluntariness when considering McDuffy's character in light of his interrogators' conduct. The Officers testified that McDuffy's demeanor was calm, his answers were coherent, and they had no reason to suspect that he has any mental illness. The Video appears to support the Officers' testimony as to their observation of McDuffy. McDuffy appears alert and coherent in the Video. He had planned and carried out a multi-step crime earlier and, in the Video, he recalled the details of his plan, including the type of firearm and the bus route he followed to retrieve the firearm from his storage unit. When the Officers were confused about the location of his storage unit, he described the location, asked them to contact his payee, and when he realized they were going to contact her, he informed them of her work hours. McDuffy's story seems internally consistent and consistent with the evidence in the case.

McDuffy argues that the Officers failed to make further inquiries of certain answers that provided evidence of his mental illness. For example, they failed to follow up after McDuffy explained that the pin in his left leg was the result of a car accident from 6 or 7 years ago and was unrelated to the pension he received from his service in the Marines. (ECF No. 46-1 at 27-28.) McDuffy cites to Millsap's testimony, which indicates that the purpose of their interrogation was to get a statement, to argue that the Officers ignored evidence of his mental illness in pursuit of that goal. But law enforcement is not barred from getting a statement. As the Court observed in *Miranda*, "[c]onfessions remain a proper element in law enforcement." *Miranda*, 384 U.S. at 478.

Thus, after weighing all the relevant factors, the Court finds that McDuffy's confession was voluntary. While law enforcement did apply mental coercion (*see*

///

26

1  discussion *supra),* McDuffy confessed before an actual question was even asked when

2  Millsap said, "Let's start with what happened today." (ECF No. 46-1 at 29.)

### F.    Voluntariness of McDuffy's Consent to Warrantless Search

4  McDuffy also challenges the search of his residence and storage unit, claiming

5  the consent was not voluntary.

6  To be valid, a consent to a warrantless search must be voluntary. *United States*

7  *v. Kaplan*, 895 F.2d 618, 622 (9th Cir. 1990). In evaluating whether consent to a search

8  is voluntary, the Court must consider: (1) whether defendant was in custody; (2)

9  whether the arresting officers had their guns drawn; (3) whether *Miranda* warnings were

10  given; (4) whether the individual was told he had the right not to consent; and (5)

11  whether the individual was told that a search warrant could be obtained. *United States*

12  *v. Cormier*, 220 F.3d 1103, 1112 (9th Cir. 2000).

13  Applying these factors, the Court concludes that consent was voluntary. The

14  government does not dispute that McDuffy was in custody. McDuffy was advised of his

15  *Miranda* rights and the Court has determined that his waiver was valid. *See* discussion

16  *supra.* Finally, even though McDuffy was not told that a search warrant could be

17  obtained, Millsap explained the consent form to McDuffy, including his right to refuse to

18  consent. (ECF No. 46-1 at 65-66, 69-70; Gov't Exhs. 3, 4.)

### VI.    CONCLUSION

20  The Court notes that the parties made several arguments and cited to several

21  cases not discussed above. The Court has reviewed these arguments and cases and

22  determines that they do not warrant discussion as they do not affect the outcome of

23  these motions.

24  ///

25  ///

26  ///

27  ///

28  ///

1    It is therefore ordered that the following motions are denied: motion to dismiss

2 count two (ECF No 42); motion to recognize the specific intent *mens rea* requirement

3 (ECF No. 45); and motion to suppress (ECF No. 46).

4    DATED THIS 13th day of July 2016.

5

6                                   _____

MIRANDA M. DU

7                                   UNITED STATES DISTRICT JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28